## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

PAUL JANCZAK,               )
                                  )
             **Plaintiff,**       )
                                  )
**v.**                               )       **Case No. 13-CV-0154-CVE-FHM**
                                  )
**TULSA WINCH, INC.**          )
                                  )
                                  )
           **Defendant.**      )

## OPINION AND ORDER

Before the Court are Defendant Tulsa Winch, Inc's Motion for Summary Judgment and Brief in Support (Dkt. # 61) and Plaintiff's Motion for Partial Summary Judgment (Dkt. # 64). In its motion for summary judgment, Tulsa Winch, Inc. (TWI) argues that it did not violate plaintiff's rights under the Family and Medical Leave Act (FMLA), because plaintiff's position "was eliminated for legitimate business reasons unrelated to [p]laintiff's use of FMLA." Dkt. # 61, at 6. Plaintiff responds that there is a dispute as to the veracity of TWI's claim that plaintiff's position was eliminated for legitimate business reasons. Dkt. # 88, at 4-5. In his motion for partial summary judgment, plaintiff argues that there is no genuine issue of material fact precluding judgment as a matter of law that TWI interfered with his FMLA rights. Dkt. # 64, at 1. TWI responds that it did not interfere with plaintiff's FMLA rights because it eliminated plaintiff's position "for legitimate business reasons unrelated to his FMLA leave." Dkt. # 85, at 4.

# I.

The following facts are undisputed. On June 21, 2010, plaintiff was hired by TWI as the general manager (GM) for TWI's British Columbia operations. Dkt. # 61, at 8; Dkt. # 88, at 5. At some point, the exact date being in dispute, TWI began assessing the management structure of this Canadian operation and the necessity of a GM position in a matrix reporting structure.[1]

Plaintiff was a U.S. employee and was paid from Jenks, Oklahoma. Dkt. # 65, at 5; Dkt. # 85, at 5. As GM, plaintiff had full profit and loss responsibility for two business units. Dkt. # 61, at 8; Dkt. # 88, at 5. "Plaintiff had direct responsibility for all functions of both business units except for the Sales and Marketing function that reported to the Vice President of Sales and Marketing at corporate headquarters in Jenks, Oklahoma [HQ]." Dkt. # 61, at 8; see also Dkt. # 88, at 5. One of plaintiff's initial duties was to integrate the two units. Dkt. # 61, at 8; Dkt. # 88, at 6. The units were integrated and moved to a new facility. Dkt. # 61-1, at 20. Plaintiff originally reported to Andrew Masullo, the vice president of operations for TWI at HQ. Dkt. # 61, at 8; Dkt. # 88, at 6.

On May 1, 2012, Steve Oden, president of TWI at HQ, informed Bill Spurgeon, president of Dover Energy, Inc. (Dover)--TWI is a wholly owned subsidiary of Dover--, of a plan to discharge Masullo in late May and stated that plaintiff would continue to lead the Canadian operation. Dkt.

---

[1]     TWI describes a matrix reporting structure as one in which the Canadian department heads would report to functional executives in Jenks, Oklahoma. Dkt. # 61, at 9. A matrix structure is traditionally marked by parallel reporting relationships. Christopher A. Bartlett & Sumantra Ghoshal, Matrix Management: Not a Structure, a Frame of Mind, Harv. Bus. Rev., July-Aug. 1990 at 1, 3; see also Robert D. Dickey, Interstate Branching: Doubts About Economies and Managing Networks, 11 No. 13 Banking Pol'y Rep. 1 (1992) ("This stage is often referred to as "matrix management" where units might report to one executive on functional matters-such as lending, human resources, product development-and to an another for geographical matters.").

# 29, at 2; Dkt. # 65, at 5; Dkt. # 85, at 5.  Masullo was terminated on May 24, 2012, because of his "inappropriate management style, including his bullying of employees."  Dkt. # 65, at 5; Dkt. # 85, at 5.  Plaintiff thereafter reported to Oden.  Dkt. # 61, at 8; Dkt. # 88, at 6.

In June 2012, following Masullo's discharge, Oden informed plaintiff that the Canadian operations were strong and that the plans for the Canadian operations were not being changed.  Dkt. # 88, at 8; see also Dkt. # 104, at 6.  That same month, plaintiff was informed by Oden that the Canadian managers respected plaintiff.  Dkt. # 88, at 8; see also Dkt. # 104, at 6.  On June 5, 2012, Oden reported to Spurgeon that there were no transition issues.  Dkt. # 65, at 6; Dkt. # 85, at 5.  During the week of June 18, 2012, Oden told plaintiff that plaintiff had "good rapport with the staff" and that plaintiff "would be given the opportunity to demonstrate his leadership skills."  Dkt. # 88, at 8; see also Dkt. # 104, at 6.

On June 26, 2012, Oden met with Cheryl Bailey, the director of human resources.  Dkt. # 88, at 8; see also Dkt. # 104, at 6.  An e-mail recapping the meeting states that plaintiff was "being given the opportunity to demonstrate his leadership capabilities."  Dkt. # 93-2, at 1.  It also states that Bailey believed that the Canadian reporting structure was unclear.  Id.  Oden and Bailey met again on July 6, 2012.  Dkt. # 88, at 9; see also Dkt. # 104, at 6.  Bailey's handwritten notes on that meeting do not specifically mention that the elimination of the GM position had been discussed.  Dkt. # 93-3.

TWI conducted its annual talent review in "mid-July 2012."  Dkt. # 61, at 10; see also Dkt. # 88, at 6.  "The Talent Review is an internal process in which the executive team and their direct reports are evaluated and discussed for succession and developmental purposes."  Dkt. # 61, at 10; see also Dkt. # 88, at 6.  In connection with the review, Oden completed an annual summary for

plaintiff.  Dkt. # 61, at 10; Dkt. # 88, at 6.  In the annual summary, Oden remarked that "this is [plaintiff's] chance to show me that he has what it takes to provide the leadership this organization needs . . . ."  Dkt. # 93-4, at 4.  Plaintiff was rated as having "Met Expectations" in his annual performance summary, and his overall competency rating was that he "Meets Expectations."  Dkt. # 93-4, at 10.  However, plaintiff's leadership competency ratings were all designated "Too New to Rate."  Id.  Oden attributed this to the fact that, prior to Masullo's termination, Masullo had been inserting himself between plaintiff and those who reported to plaintiff "in a controlling and manipulative fashion" and had thus marginalized plaintiff's role to the degree that Oden could not adequately rate him.  Id. at 2, 10.[2]  However, Oden noted that, after Masullo's removal, plaintiff had "begun demonstrating the leadership you would expect to find in a [GM]" and that plaintiff had "demonstrated enthusiasm about our new structure and the opportunity [to] demonstrate his leadership skills."  Id. at 10.  Oden further stated that he looked forward to seeing plaintiff take full advantage of the opportunity to demonstrate his leadership skills and that there would be further review at the end of the third quarter.  Id. at 10.

Oden's comments from the 2012 annual summary "were included in the 2012 Success Factors segment talent review."  Dkt. # 88, at 9; Dkt. # 104, at 7.  The segment talent review lists plaintiff among the "LEADERSHIP TEAM, HIGH POTENTIALS."  Dkt. # 93-5, at 27 (capitalization in original).  However, the segment talent review document suggests that plaintiff is not a "high potential," but rather a member of the leadership team.  See Dkt. # 93-5, at 6.  The segment talent review document also states that "[l]eadership and org [sic] structure in Canada is

---

[2]      Additionally, Oden later stated that he had rated plaintiff as "Too New to Rate" because plaintiff had only been directly reporting to him for less than two months.  Dkt. # 61-2, at 3.

under review" and that it was unknown if plaintiff's GM position would have to be filled within twelve months. Dkt. # 93-5, at 3, 5. Oden states that he stated that the reason it was "unknown" as to whether the GM position would need to be filled within twelve months was because he was evaluating whether plaintiff was right for the job and whether a GM was needed in general. Dkt. # 61-2, at 3.[3] The talent review meeting occurred on approximately July 13, 2012, and the segment talent review document must have been prepared on approximately that date as well. Dkt. # 61-8, at 42-47 (stating that a talent review meeting took place the week of July 13, 2012, and that the talent review meeting used a slide deck matching the description of the segment talent review document); see e.g., Dkt. # 93-5, at 9 (stating that the report displayed on the slide was generated on July 13, 2012).[4]

Between July 25 and 27, 2012, Oden attended a quarterly meeting in Canada and spoke with plaintiff. Dkt. # 89, at 3. Oden did not express any concerns about the Canadian operation or discuss any reorganization of the Canadian operation. Id. On July 27, 2012, Andrea Rowley, Dover vice president of human resources, distributed an e-mail stating: "[plaintiff] update at end of Q3 or early Q4." Dkt. # 93-6, at 1. The e-mail also included an attached report, which stated that plaintiff would be reviewed again in October 2012. Id. at 5-7. Between July 16 and 19, 2012, plaintiff

---

[3]     Plaintiff argues that that statement is inconsistent with the 2012 annual summary and the segment talent review document. Dkt. # 88, at 6. The statement is not inconsistent with the summary and document. The annual summary does not pertain to the unknown rating (see Dkt. # 93-4) and the segment talent review document acknowledges that the leadership and organization structure in Canada were under review (Dkt. # 93-5, at 3).

[4]     One e-mail suggests that a "Segment-level review" had not yet occurred on July 27, 2012. Dkt. # 93-6, at 1. However, that e-mail also contains, as an attachment, a PowerPoint deck entitled "Segment Talent Review - Action Items." Id. at 3-7. Action items are not to be completed until after the "Talent Segment Review Meeting." Dkt. # 93-5, at 51. Therefore, "Segment-level review" is likely a separate meeting from the "Segment Talent Review."

attended leadership training. Dkt. # 88, at 9; Dkt. # 104, at 7. Additionally, in mid-July, TWI "began the process of assigning an executive coach to [plaintiff]." Dkt. # 88, at 9; <u>see also</u> Dkt. # 104, at 6. On July 30, 2012, Jillian Evanko,[5] vice president - finance at TWI, e-mailed plaintiff advising him to obtain a "Social ID"[6] as soon as possible. Dkt. # 88, at 9; <u>see also</u> Dkt. # 104, at 6.

"On July 30, 2012, Plaintiff had a motorcycle accident and was granted FMLA leave beginning on July 31, 2012." Dkt. # 61, at 11; <u>see also</u> Dkt. # 88, at 7. On August 6, 2012, TWI sent plaintiff the FMLA paperwork confirming plaintiff's eligibility for FMLA leave. Dkt. # 65, at 8; Dkt. # 85, at 8. "Plaintiff's FMLA leave was never mentioned by Oden, Bailey, or Evanko when they were discussing the need for a GM." Dkt. # 61, at 11; <u>see</u> Dkt. # 88, at 7. FMLA leave is regularly granted by TWI to its employees, who return to work without incident. Dkt. # 61, at 12; Dkt. # 88, at 7.

On August 7, 2012, Oden sent an e-mail to Spurgeon. Dkt. # 93-9, at 1. In it, Oden stated that he was recruiting for the materials manager position, a position that would "report to the GM for as long as we have one." <u>Id.</u> He also stated that:

> While this is being done, we will be evaluating [plaintiff's] performance as GM and the need for a GM in general. Having said that, I am generally not a fan of a highly matrixed and remote management structure. Particularly in the case of our Canadian operation where we are doing and will likely do more projected based business in the offshore market. I think we will need a strong onsite presence to make sure things are getting done. Is [plaintiff] the guy for that? We agreed to give him time to demonstrate his capabilities while we address the needs listed . . . above.
>
> I really think we have a good plan in place. There is nothing broken in Canada as evidenced by their strong and still improving performance.

---

[5]     Jillian Evanko is now known as Jillian Harris. Dkt. # 61-6, at 1.

[6]     It is unclear from the summary judgment record what a "Social ID" is.

Id.  At that time, Oden had not decided to eliminate the GM position and was still giving plaintiff

"the opportunity to demonstrate his capabilities."  Dkt. # 93-22, at 7, 8.

On August 13, 2012, Oden sent an e-mail to plaintiff asking if he would be available to

briefly "visit" the next afternoon,[7] in order to discuss the termination of the Canadian operations

manager, Renae Reiter.  Dkt. # 88, at 10; Dkt. # 93-10, at 1; Dkt. # 104, at 7.  On the afternoon of

August 14, 2012, a meeting was held in Oden's office, to which Oden, Bailey, Evanko, and Dave

Rowland, director of supply chain, were invited, although only Oden, Bailey, and Evanko attended.

Dkt. # 93-11, at 1; Dkt. # 93-22, at 9, 10.  Between August 7 and 14, 2012, Oden had not received

any new information relevant to decision of whether to terminate plaintiff.  Dkt. # 93-22, at 20.

Additionally, Oden sent an e-mail to Spurgeon on August 14 at 8:41 a.m.  Dkt. # 93-12.  In

it, Oden stated that two positions would be direct reports to the GM and that, in plaintiff's absence,

Rowland would provide oversight and direction.  Id. at 1.  Oden further stated that he was "confident

that the plan in place will be successful in addressing the near term needs or [sic] the organization"

and that one of the top priorities was to "further evaluate [plaintiff's] ability to provide the necessary

leadership."  Id.

On August 21, 2012, Oden sent an e-mail to Spurgeon, in which he stated that "Rowland will

be providing oversight of the supply chain and manufacturing area during [plaintiff's] absence which

is estimated to run for the next three weeks."  Dkt. # 93-13, at 1.  Additionally, Oden released an

organization announcement stating that Reiter had left the company and that two positions, which

---

[7]      Although it is unclear from the summary judgment record, presumably this "visit" refers to
a telephonic communication; there is no evidence in the summary judgment record that this
communication took place.

would effectively replace her position, would report to the GM.[8] Dkt. # 61-2, at 4; Dkt. # 93-14. TWI also received plaintiff's FMLA certification on that same day, August 21, 2012. Dkt. # 88, at 10; Dkt. # 104, at 7. It stated that the probable duration of plaintiff's condition was undetermined, that plaintiff was unable to perform any of his job functions, that plaintiff had been and continued to be incapacitated because of his condition for an indefinite period of time, that plaintiff would require follow-up treatment or a reduced schedule, and that the certifying provider was unable to determine plaintiff's treatment schedule. Dkt. # 93-15, at 2-3. However, it also stated that plaintiff had been seen by another health care provider (neurosurgery and orthopedic surgery) for treatment and that those providers expected the duration of treatment to be eight weeks. Id. at 2. Bailey prepared a status update on plaintiff's injuries that could be distributed to the Canadian employees and provided that update to Oden and Evanko the evening of August 21. Dkt. # 93-16. The update stated that TWI hoped plaintiff would be able to "return to work sometime around the middle of September." Id. at 2.

On August 24, 2012, Bailey sent an e-mail to Oden describing the itinerary for a meeting to be held on August 27. Dkt. # 93-17. The itinerary included: "4. Supporting [plaintiff] (upon his return)." Id. at 2. Bailey took notes at the meeting on August 27. Dkt. # 90, at 3; Dkt. # 93-18. The notes taken by Bailey included "check Paul's [plaintiff's] contract" and "Rowland as next GM - ask" with a line drawn across "GM" and the phrase "site mgr" written above it. Dkt. # 93-18. This change was made because, while Oden and Bailey were talking, "[Oden] said 'No, we're not going to do a GM. We're eliminating that position, so that Mr. Rowland would be more of a point person

_____

[8]     Following the elimination of the GM position, those positions began reporting to HQ. Dkt. # 61-2, at 4-5.

or a site manager.'" Dkt. # 93-23, at 14. Bailey's notes also state[9] "Rowland - cover - until additional - GM - gives impression Anthony," "phase PZ out,"[10] and "what is plan for Paul [plaintiff] - eliminate position." Dkt. # 93-18. Bailey does not recall any documents relating to the logistics of terminating plaintiff being produced between August 14 and 27, 2012. Dkt. # 93-23, at 13. On August 31, 2012, Oden e-mailed Spurgeon to inform him that Rowland would be taking over as site manager for the Canadian facility, that "under this reorganization" the GM position would be eliminated and plaintiff would be terminated, that plaintiff would not be released to travel for another three weeks, and that plaintiff had been asked to come to Tulsa, Oklahoma[11] before reporting to work, at which time he would be terminated. Dkt. # 93-19.

On October 1, 2012, plaintiff returned to work, and Oden and Bailey met with plaintiff to notify him that he was being terminated because of the elimination of the GM position. Dkt. # 61, at 13; Dkt. # 88, at 7. No one replaced plaintiff as GM, and plaintiff's duties "were absorbed by the matrixed organization." Dkt. # 61-2, at 4; see also Dkt. # 61-7, at 37 ("[T]he contributions of the general manager were so small that when we eliminated the position, those-- there weren't any responsibilities to delegate out."). Plaintiff was not offered the site manager position. Dkt. # 88, at 12; Dkt. # 104, at 8. Plaintiff was informed by Oden that his termination was not due to his

---

[9] The previously described notes are preceded by the date "8-27-12." Dkt. # 93-18. However, these latter notes are preceded by the date "8-29-12." Id. The affidavit of plaintiff's counsel states that the exhibit is "a true and correct copy of notes by Bailey for a meeting on August 27, 2012." Dkt. # 90, at 3. Additionally, plaintiff's response describes all of the notes as having been taken on August 27, 2012. Dkt. # 88, at 11. Likewise, defendant's reply states there was only one meeting that took place on or about August 27, 2012. Dkt. # 61, at 13; Dkt. # 104, at 6. It appears undisputed that only one meeting occurred, but it is unclear when the latter notes were written.

[10] "PZ" refers to plaintiff. Dkt. # 61-8, at 38.

[11] Jenks, the location of HQ, is a suburb of Tulsa.

performance. Dkt. # 93-22, at 12. Plaintiff was known to have a positive attitude in the workplace and had never been disciplined for inadequate performance or inappropriate behavior at TWI. Dkt. # 65, at 8; Dkt. # 85, at 8. Oden believed that the Canadian operations of TWI were successful when plaintiff served as GM, although Oden believed that this success was not exclusively due to plaintiff. Dkt. # 65, at 8; Dkt. # 85, at 9; Dkt. # 85-6, at 26.

Oden did not recall speaking to any Canadian managers about the need for a GM. Dkt. # 93-22, at 16. No study was done prior to eliminating the GM position and no financial analysis was done before eliminating the GM position. Dkt. # 88, at 12; Dkt. # 93-22, at 19; Dkt. # 104, at 8. Bailey does not recall anyone having any conversations with any Canadian department heads or managers between July 31 and August 14, 2012, about whether a GM was needed or what plaintiff's role as GM was. Dkt. # 93-23, at 16. However, TWI often eliminated high level positions when acquired business units were integrated into TWI. Dkt. # 61, at 15; see Dkt. # 88, at 8.

At the October 1, 2012, meeting, plaintiff "asked Oden about the possibility of transferring to a different position within [TWI] or another Dover-related company." Dkt. # 65, at 9; Dkt. # 85, at 9. TWI did not consider plaintiff for another position at TWI or at another Dover-related company. Dkt. # 65, at 8; Dkt. # 85, at 8. Transfers between TWI and other Dover-related companies occur. Dkt. # 93-22, at 17; Dkt. # 93-23, at 18. Oden is unaware of any reason why plaintiff could not be rehired for an open position. Id. at 18. Bailey agrees that plaintiff is eligible to be rehired. Dkt. # 93-23, at 2.

Plaintiff's offer letter for his position provided that he would receive three months' salary in lieu of notice of termination. Dkt. # 61, at 16; Dkt. # 88, at 11. By letter dated October 12, 2012, plaintiff's counsel informed Bailey that plaintiff was entitled to the three months' salary. Dkt. # 93-

21, at 1. Bailey informed Oden and Evanko on October 19, 2012, of plaintiff's request for three months' salary in lieu of notice. Id. at 3. Plaintiff was paid the three months' salary on either November 30 or 31, 2012. Dkt. # 61, at 16; Dkt. # 88, at 11.

On November 13, 2012, Garry Jung, the Canadian controller, was terminated. Dkt. # 61-6, at 5. The stated reason was that the position of controller was being eliminated. Dkt. # 61-6, at 5. Oden states that the decision to terminate the position was made on August 3, 2012, although no documentation substantiating that assertion has been produced. Dkt. # 61-2, at 4; Dkt. # 88, at 8. Oden further states that the reason the position was eliminated was because the matrix reporting structure rendered the position duplicative and unnecessary. Dkt. # 61-2, at 4.[12]

The following facts are disputed. TWI contends that Oden, Bailey, and Evanko began to assess the Canadian organizational structure in June 2012 and had several meetings and discussions between June and August 2012 about the need for a GM in Canada. Dkt. # 61, at 9.[13] Oden, Evanko, and Bailey state that meetings held on June 26 and July 6, 2012, included discussions about whether a GM was needed in Canada and whether a matrix reporting structure should be used. Dkt.

---

[12]     Plaintiff disputes the assertion that the position of controller was eliminated because the position was "'unnecessary given the matrix reporting structure.'" Dkt. # 88, at 8 (quoting Dkt. # 61, at 14). Plaintiff's challenge to this fact is that the controller was a dual reporting position, i.e., it reported both to Evanko and plaintiff. Id.; Dkt. # 93-20. Plaintiff's challenge does not raise a genuine issue; whether a management position is duplicative and unnecessary in a matrix reporting structure is dependent on who the manager's subordinates are reporting to, not who the manager is reporting to. That the controller was reporting to multiple executives has no bearing on whether TWI would be better served by having the subordinates report directly to the executives themselves. See Dkt. # 104, at 5; see also Dkt. # 93-20 (showing that only one of the controller's subordinates reported to a position above the controller).

[13]     Contrary to TWI's statement that plaintiff "admits that Oden, Bailey, and Evanko began an assessment . . . in June 2012" (Dkt. # 104, at 1), plaintiff admits only that Oden, Bailey, and Evanko "may" have begun an assessment in June 2012 (see Dkt. # 88, at 6).

# 61-2, at 2;  Dkt. # 61-3, at 2; Dkt. # 61-6, at 2.  They also state that Evanko believed the GM position should be eliminated.  Dkt. # 61-2, at 2;  Dkt. # 61-3, at 2; Dkt. # 61-6, at 2.  Plaintiff contends that the documents memorializing these meetings do not suggest that any such discussion took place and instead suggest that TWI intended for plaintiff to remain as GM and to receive an opportunity to prove himself.  Dkt. # 88, at 6.

TWI asserts that as of June 18, 2012, "the business structure in Canada was evolving toward a matrix reporting structure wherein most of the Canadian department heads were reporting directly to the functional executives at HQ, instead of the GM."  Dkt. # 61, at 9.  Plaintiff contends that there was not a move towards a more matrixed structure; rather, dual-reporting was "always there."  Dkt. # 61-1, at 27.  However, sometime after Evanko was hired in January 2012, at least one department head began directly reporting to Evanko at HQ instead of to plaintiff.  Dkt. # 61-1, at 28.

Oden states that he decided on August 14, 2012, to eliminate the GM position in Canada, because the company had evolved into a matrix business structure and the GM position no longer performed significant responsibilities.  Dkt. # 61-2, at 3.  Oden states that he informed Bailey, Evanko, and Rowland of this decision the same day.  Id.  Oden states that on August 27, 2012, he merely instructed Bailey to begin processing the termination paperwork--as opposed to actually deciding to terminate plaintiff at that meeting.  Dkt. # 61-2, at 4.  Plaintiff argues that the decision to terminate his employment was not made until August 27, 2012, and that several evidentiary materials support this interpretation.  Dkt. # 88, at 7; see e.g., Dkt. # 93-18.[14]  Oden is unaware of

---

[14]      However, for the purposes of his motion for partial summary judgment, plaintiff assumes that the decision was made on August 14, 2012.  Dkt. # 65, at 4.

any documentation showing that the decision to terminate plaintiff was made on August 14, 2012. Dkt. # 93-22, at 9.

Plaintiff states that on August 23, 2012, he and his wife spoke with Oden about his medical condition, including about his wife's concerns regarding the possibility of cognitive difficulties as a result of the accident. Dkt. # 89, at 3. TWI states that neither plaintiff nor his wife "testified as to this alleged conversation during their depositions." Dkt. # 104, at 8.[15]

TWI maintains that it has "no policy or practice of transferring executive level employees to another position within TWI or a different Dover entity following elimination of the executive's position." Dkt. # 61, at 15; see also e.g., Dkt. # 61-2, at 4. It states that "[a]ll of the managers under Oden's chain of command who 'transferred' to other Dover entities were actually promotions of employees considered 'High Potential' or 'Emerging Talent' . . . . Further, all of these employees were recruited by the other Dover entity - not TWI." Dkt. # 61, at 15. Plaintiff contends that the "Success Factors program" allowed managers in a Dover company to hire management and supervisory level employees at other Dover companies, which allowed for the transfer of managers. Dkt. # 89, at 4.

---

[15]    It is true that plaintiff never testified in his deposition as to this specific conversation or its content. Neither party provided plaintiff's wife's deposition, so the summary judgment record supports TWI's statement. In his deposition, plaintiff did state that his wife provided updates to Oden about his condition. Dkt. # 61-1, at 53. However, plaintiff did not further describe the content of the conversations. See Dkt. # 61-1, at 53. TWI states that later conversations suggested that plaintiff would make a full recovery. Dkt. # 104, at 8. These later conversations are irrelevant because they occurred after the date plaintiff has alleged TWI decided to terminate him, i.e., August 27, 2012 (additionally, some of the conversations deal only with plaintiff's ability to travel and not his cognitive capacity). See Dkt. # 61-3, at 23-24.

TWI argues that the delay in plaintiff's payment in lieu of notice was an honest mistake, due to the fact that employees paid out of HQ do not normally receive notice pay. Dkt. # 61, at 4. Bailey claims she realized her mistake on October 22, 2012. Dkt. # 61-3, at 6. Plaintiff argues that Bailey may have learned of the obligation earlier and, even if she did not, the payment may have been delayed further in retaliation for plaintiff invoking his FMLA rights. Dkt. # 88, at 23-24. Plaintiff also implies that the payment may have been delayed because of the ongoing settlement negotiations between plaintiff and TWI. Id. at 13. Bailey blames the delay between discovering the mistake and sending the payment to plaintiff on logistical factors. Dkt. # 61-8, at 25.

On March 18, 2013, plaintiff filed suit against TWI.[16] Dkt. # 2. Plaintiff alleges that TWI interfered with the exercise of his FMLA rights and retaliated against him for engaging in an FMLA protected activity by terminating plaintiff's employment, refusing to pay post-termination compensation to which plaintiff was entitled, refusing to reinstate plaintiff, and refusing to allow plaintiff to transfer to another position.[17] Dkt. # 2, at 6-8. Plaintiff seeks a declaration that TWI violated the FMLA when it terminated plaintiff, damages, costs, attorney fees, expert witness fees, and the reinstatement of plaintiff or front pay in lieu of reinstatement. Id. at 10.

On March 27, 2014, TWI filed a motion for summary judgment, and plaintiff filed a motion for partial summary judgment. Dkt. ## 61, 64. In its motion for summary judgment, TWI argues

---

[16]    Plaintiff also filed suit against Dover Corporation. Dkt. # 2. Dover is a wholly owned subsidiary of Delaware Capital Holdings, Inc., which is a wholly owned subsidiary of Delaware Capital Formation, Inc., which is a wholly owned subsidiary of Dover Corporation. Dkt. # 29, at 2. On March 24, 2014, the parties stipulated to the dismissal with prejudice of Dover Corporation as a party defendant. Dkt. # 56.

[17]    Plaintiff also alleged claims of breach of contract and promissory estoppel. Dkt. # 2, at 8-10. On March 24, 2014, the parties stipulated to the voluntary dismissal with prejudice of those claims. Dkt. # 56.

that plaintiff is unable to establish a causal link between his termination and his FMLA leave, that plaintiff is not entitled to an equivalent position or transfer, and that the delay in payment is not an adverse action. Dkt. # 61. Plaintiff responded (Dkt. # 88), and TWI replied (Dkt. # 104). In his partial motion for summary judgment, plaintiff argues that his FMLA interference claim based upon his termination must succeed as a matter of law because TWI cannot meet satisfy its burden of establishing that plaintiff was terminated for a reason unrelated to his FMLA leave. Dkt. # 64. TWI responded (Dkt. # 85), and plaintiff replied (Dkt. # 103).

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993). The plain language of Rule 56© mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S.

574, 586-87 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 250. In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

### III.

Plaintiff has alleged both FMLA interference claims and FMLA retaliation claims for each of the alleged adverse employment actions. Under the FMLA, an employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided." 29 U.S.C. § 2615(a)(1). To establish an FMLA interference claim, a plaintiff must show "(1) that he was entitled to FMLA leave, (2) that some adverse action by the employer interfered with his right to take FMLA leave, and (3) that the employer's action was related to the exercise or attempted exercise of his FMLA rights." Jones v. Denver Pub. Sch., 427 F. 3d 1315, 1319 (10th Cir. 2005). The third element of an FMLA interference claim requires a causal connection between the adverse action and the exercise of FMLA rights. Satterlee v. Allen Press, Inc., 274 F. App'x 642, 645 (10th Cir. 2008);[18] Metzler v. Fed. Home Loan Bank of Topeka, 464 F.3d 1164, 1181 (10th Cir. 2006). An employee may allege an FMLA interference claim based on interference with the right to take the full amount of FMLA leave, the denial of reinstatement after taking FMLA leave, or the denial of initial

---

[18] This and other unpublished opinions are cited for their persuasive value. See 10th Cir. R. 32.1(A).

permission to take FMLA leave.  Campbell v. Gambro Healthcare, Inc., 478 F.3d 1282, 1287 (10th Cir. 2007).  Under an interference theory, an employer's intent in denying or interfering with an employee's FMLA rights is not relevant.  See Bones v. Honeywell Int'l, Inc., 366 F.3d 869, 877 (10th Cir. 2004).  Nonetheless, the FMLA is not a strict liability statute, and nothing in the FMLA entitles an employee to greater protection from termination not related to his FMLA leave.  Metzler, 464 F. 3d at 1180.

Additionally, FMLA "makes it unlawful for an employer to retaliate against an employee for exercising her rights to FMLA leave."  Khalik v. United Air Lines, 671 F.3d 1188, 1193 (10th Cir. 2012); see also 29 U.S.C. § 2615(a).  FMLA retaliation claims are subject to the burden-shifting framework of McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973).  Campbell, 478 F.3d at 1287.  To make out a prima facie FMLA retaliation claim, a plaintiff must show that "(1) she engaged in a protected activity; (2) [her employer] took an action that a reasonable employee would have found materially adverse; and (3) there exists a causal connection between the protected activity and the adverse action."  Metzler, 464 F.3d at 1171.  The Tenth Circuit characterizes "the showing required to satisfy the third prong under a retaliation theory to be a showing of bad intent or 'retaliatory motive' on the part of the employer."  Campbell, 478 F.3d at 1287 (quoting Metzler, 464 F.3d at 1171).  If plaintiff can establish a prima facie case of FMLA retaliation, the burden shifts to the employer to articulate a legitimate non-discriminatory reason for the adverse employment action.  Id. at 1290.  The burden shifts back to the plaintiff to "show that there is a genuine dispute of material fact as to whether [the employer's] reasons for terminating her are pretextual."  Id. (quoting Metzler, 464 F.3d at 1172).  To establish a genuine dispute of material fact as to pretext, a plaintiff cannot rely solely on temporal proximity of her FMLA leave and the adverse employment

action, and the plaintiff must offer some other evidence of retaliatory motive. <u>Metzler</u>, 464 F.3d at 1172.

**A. TWI's Motion for Summary Judgment**

**1. Plaintiff's Termination**

It is undisputed that plaintiff engaged in a protected activity when he took FMLA leave. Likewise, plaintiff's termination from his position as GM--which can also be characterized as a failure to reinstate plaintiff following his FMLA leave--was a materially adverse action. However, plaintiff has failed to establish a <u>prima facia</u> case for retaliation based upon the termination, because he cannot establish a causal connection between his FMLA leave and his termination.

It is undisputed, that during the week of July 13, 2012, TWI was evaluating the organizational structure of its Canadian operations and contemplating the elimination of the GM position. Dkt. # 61-2, at 3; Dkt. # 61-8, at 42-47; Dkt. # 93-5, at 3, 5. By June 26, 2012, members of TWI management, specifically Bailey, believed that the Canadian reporting structure was unclear. Dkt. # 88, at 8; Dkt. # 93-2, at 1; <u>see also</u> Dkt. # 104, at 6. A document prepared in the week of July 13, 2012--the segment talent review document, prepared in conjunction with the annual talent review--states that the "[l]eadership and org [sic] structure in Canada is under review" and that it was "Unknown" if plaintiff's GM position would have to be filled within twelve months, and Oden states that the reason it was "Unknown" was because he was evaluating whether plaintiff was right for the job and whether a GM was needed in general. Dkt. # 61-2, at 3; Dkt. # 93-5, at 3, 5; <u>see also</u> Dkt. # 61-8, at 42-47 (stating that a talent review meeting took place the week of July 13, 2012, and that the talent review meeting used a slide deck matching the description of the segment talent review document); Dkt. # 93-5, at 9 (stating that the report displayed on the slide was generated on

July 13, 2012). Plaintiff was not injured in his motorcycle accident until July 30, 2012, and his FMLA leave did not begin until July 31, 2012. Dkt. # 61, at 11; Dkt. # 88, at 7. Thus, TWI contemplated the elimination of the GM position before plaintiff commenced his protected activity.

If an employer has begun contemplating a course of action prior to learning that an employee has commenced a protected activity, the employer may take that previously planned action despite learning of the employee's protected activity. See Clark Cnty. School Dist. v. Breeden, 532 U.S. 268, 272 (2001) (per curiam); see also Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 309 (3d Cir. 2012) (recognizing that Breeden applies to FMLA cases); Mauder v. Metro. Transit Auth. of Harris Cnty., Tex., 446 F.3d 574, 584 (5th Cir. 2006) (applying Breeden's analysis to an FMLA claim). In Breeden, an employee's supervisor "mentioned . . . that she was contemplating transferring [the employee]." Breeden, 532 U.S. at 271-72. The supervisor's comment that she was contemplating transferring the employee was made after the employee filed a lawsuit against her employer, but before the supervisor learned of the lawsuit's existence. Id. The employee was not transferred until after the supervisor learned of the lawsuit. Id. The Supreme Court held that the fact that employee's transfer occurred after her supervisor learned of the suit was not evidence that the filing of the suit caused her transfer. Id. "[P]roceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality."[19] Id. Because TWI was contemplating the elimination of the GM position prior to plaintiff's FMLA leave, his termination

---

[19]     Because the key factor under Breeden is when the employer began contemplating an action, and not when the employer definitively decided to take the action, the dispute as to when TWI decided to eliminate the GM position is immaterial.

from the position of GM cannot be used as evidence of causality.[20]  Because plaintiff has not met

the causality prong of the retaliation claim in relation to his termination, TWI's motion for summary

judgment should be granted as to this claim.

Unlike in a retaliation claim, an employer defending against an interference claim has the

burden of proving that it would have terminated the employee regardless of the employee's FMLA

leave.  Sabourin v. Univ. of Utah, 676 F.3d 950, 962 (10th Cir. 2012).  To prevail on a motion for

summary judgment against an interference claim based upon that argument, the employer must

produce a sufficient body of undisputed evidence such that a reasonable juror could not find another

reason.  Id.  TWI has met this burden.  It has provided undisputed evidentiary materials showing that

it was contemplating eliminating plaintiff's position prior to his FMLA leave.  Such evidentiary

materials establish a reason that plaintiff was terminated wholly independent of his FMLA leave.

See Breeden, 532 U.S. at 272.  Given an employer's right to proceed with contemplated plans

despite an employee's protected action (see id.), this evidence is such that a reasonable juror could

find no other reason for the termination.  TWI's motion for summary judgment should be granted

as to this claim as well.

--------

[20]     Plaintiff correctly notes that corporate restructuring justifications are viewed with suspicion
if the plaintiff's position is the only one eliminated in the restructuring.  See Plotke v. White,
405 F.3d 1092, 1100 n.9 (10th Cir. 2005).  However, this rule does not apply in this case;
it is undisputed that at least one other position was eliminated (the position of controller) due
to the corporate restructuring.  Dkt. # 61-2, at 4.  Plaintiff's only other argument, besides the
temporal proximity of his termination to his FMLA leave (which is foreclosed by Breeden),
is that TWI employees had repeatedly stated that plaintiff would be given a chance to prove
himself as a leader.  This does not create a genuine dispute of a material fact; there is no
reason to think that those assurances were not contingent on the GM position's continued
existence.  Likewise, any investment in plaintiff, such enrolling him in leadership courses
and with an executive coach prior to the decision to eliminate his position reflects the fact
that a decision had not yet been reached; plaintiff may have continued to work as GM, and
TWI needed to be prepared for that possibility.

### 2. TWI's Failure to Place Plaintiff in an Equivalent Position and to Allow Plaintiff to Transfer

Plaintiff argues that he should have been placed into an equivalent position or allowed to transfer to another position in the company. Dkt. # 2, at 6. Upon return from FMLA leave, an employee is entitled to be restored to his previous position or an equivalent position. 29 U.S.C. § 2614(a)(1). However, an employee taking FMLA leave is not entitled to "any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave." 29 U.S.C. § 2614(a)(3); see also Campbell, 478 F.3d at 1289 (stating that an employee who requests FMLA leave and whose employment is terminated for reasons unrelated to the FMLA request would receive no greater protections than if the termination had occurred before the FMLA request). Thus, an employee whose position is eliminated while on FMLA leave, for reasons unrelated to the FMLA leave, is not entitled to reinstatement to an equivalent position.[21] See Easley v. YMCA of Metro. Milwaukee, Inc., 335 F. App'x 626, 632 (7th Cir. 2009) (holding that if an employee's position is eliminated for reasons unconnected to his leave, he has no right to reinstatement into an equivalent position); Holpp v. Integrated Commc'ns Corp., 214 F. App'x 176, 178-79 (3d Cir. 2007) (holding that an employee does not have a right to reinstatement in an equivalent position if the employee is discharged for reasons unrelated to the leave); see also Meltzer, 464 F.3d at 1180 (suggesting that an employee may be refused reinstatement after taking FMLA leave if that refusal would have occurred regardless of

---

[21]    The reasoning behind this rule is that an employee on FMLA leave is not entitled to any rights that the employee would not have been entitled to had he not taken leave, that an employee who is not on FMLA leave whose position is eliminated is not entitled to an equivalent position, and that, therefore, an employee on FMLA leave whose position is eliminated is not entitled to an equivalent position upon return, as that would place the employee on FMLA leave in a better position than if employee had never taken FMLA leave.

whether the employee took FMLA leave).  Because, as discussed <u>supra</u>, plaintiff's position was eliminated for reasons unrelated to his FMLA leave, plaintiff is not entitled to an equivalent position.  Likewise, plaintiff is not entitled to a transfer to another position, as he would not have been entitled to a transfer had he not taken FMLA leave.[22]  TWI's motion for summary judgment should be granted as to these claims.

### 3.  TWI's Delay in Paying Plaintiff His Compensation in Lieu of Notice

Plaintiff argues that TWI retaliated against him by failing to promptly pay him three months' salary in lieu of notice.[23]  This fails to satisfy the second prong of a retaliation claim; it does not state an adverse action.  Plaintiff received his payment within two months of being terminated.  Dkt. # 88, at 7, 8 (acknowledging that plaintiff was terminated on October 1, 2012, and stating that plaintiff received his compensation in lieu of notice on November 30, 2012).  A two month delay in receiving compensation, without further evidence of hardship, is not a materially adverse action.  <u>See</u> <u>Herron v. DaimlerChrysler Corp.</u>, 388 F.3d 293, 301 (7th Cir. 2004) (holding that a two-month delay in overtime pay is a minor annoyance, not an adverse action); <u>Mayers v. Campbell</u>, 87 F. App'x 467, 471 (6th Cir. 2003) (holding that a fifty-three day delay in receiving back pay is not a materially adverse action); <u>Simmons v. Potter</u>, No. 08-cv-02593-WYD-KLM, 2010 WL 3002038, at *9 (D. Colo. July 29, 2010) ("Brief delays in pay are not 'adverse employment actions.'");  <u>Miller v. N.Y.</u>

---

[22]    Regardless of whether plaintiff was eligible for a transfer program, a fact that is in dispute, there have been no evidentiary materials presented suggesting that plaintiff was affirmatively entitled to a transfer.

[23]    Plaintiff also states that this delayed payment constitutes interference with his FMLA rights.  Dkt. # 2, at 6.  However, plaintiff fails to explain how this delay in payment, which necessarily occurred after plaintiff finished his FMLA leave and was terminated, interfered with his exercise of his FMLA rights.  No reasonable jury could find that the delayed payment states a claim for FMLA interference.

<u>City Health & Hosp. Corp</u>, No. 00 Civ. 140(PKC), 2005 WL 2022016, at *5, *6 (S.D.N.Y. Aug. 22, 2005) (stating that, absent evidence to the contrary, a seven-month delay in payment was not an adverse action, but a mere inconvenience). Because plaintiff has not shown that the delay in payment was an adverse action, TWI's motion for summary judgment should be granted as to this claim.

**B. Plaintiff's Motion for Partial Summary Judgment**

Plaintiff's moves for partial summary judgment on the grounds that his FMLA interference claim based upon his termination must succeed as a matter of law, because TWI is unable to show that plaintiff's termination was unrelated to his FMLA leave. As discussed <u>supra</u>, TWI's evidentiary materials demonstrate that no reasonable juror could find that plaintiff's termination was related to his FMLA leave or that plaintiff's FMLA rights were interfered with by his termination. As such, plaintiff's motion for partial summary judgment must fail.

**IT IS THEREFORE ORDERED** that Defendant Tulsa Winch, Inc's Motion for Summary Judgment and Brief in Support (Dkt. # 61) is **granted**. A separate judgment is entered herewith.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Partial Summary Judgment (Dkt. # 64) is **denied**.

**IT IS FURTHER ORDERED** that Plaintiff's Motions in Limine (Dkt. # 96), Defendant's Motions in Limine to Exclude Certain Evidence and Brief in Support (Dkt. # 97), and Defendant's Motion for Leave to File Defendant's *Daubert* Motion and Brief to Exclude the Testimony of Plaintiff's Proposed Expert Witness Kathy Bottroff (Dkt. # 120) are **moot**.

**DATED** this 27th day of May, 2014.

_____
CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE

23